FILED
04 MAR 30 AM 11:29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA
Plaintiff,

vs.

No: 04CR66 BB

MARIO AISPURO-GAMEZ
Defendant,

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Mario Aispuro-Gamez, through his attorney, Edward Chavez, Jr. and pursuant to this Court's ruling at a hearing on Defendant's Motion To Suppress on March 17, 2004, submits the following proposed findings of fact and conclusions of law in support of this Court's order suppressing the evidence against him:

**PROPOSED FINDINGS OF FACT**

1. On December 15, 2003, Drug Enforcement Administration Special Agents, Perry and Himes, began surveillance in the area of 701 Main Street in Belen, New Mexico. This location is the address of Al's Mini Mart Gas/Convenience Store. The purpose of this surveillance was to make contact with Co-Defendants Antonio Meza-Aguilar and Juan Carlos Morales-Gracia. Meza-Aguilar and Morales-Gracia were the subjects of an investigation by the agents for narcotics trafficking and were believed to possibly be arriving from El Paso, Texas, by bus, with suspected contraband. At approximately 1:38 p.m., the Agents observed a bus drop off the two individuals across



the street from the Mini Mart. Meza-Aguilar was talking on a cellular phone at the time.

2. At the above stated time both agents followed the two individuals into the store. Once inside the store, S/A Perry made contact with Meza-Morales and ultimately obtained permission to search Meza-Morales. S/A Perry searched Meza-Morales and found what he believed to be narcotics in the inner sole of one of his shoes. Meza-Morales was then placed under arrest. A similar encounter occurred between S/A Himes and Morales-Gracia. Likewise, S/A Himes located suspected narcotics in Morales-Gracia's shoe and in a pair of shoes he was carrying in a shopping bag. He too was placed under arrest.

3. Following their arrest, the two were taken by the Special Agents to the back storage room of the store. Once there, the two were asked who the individual was that was to pick them up. Meza-Aguilar stated that they did not know who it would be, but that they would be driving a grey colored Jeep Cherokee. Thereafter, Meza-Aguilar received a phone call and was told by the person calling that he was on his way and was driving a small grey truck. Shortly thereafter, Meza-Morales received another call, with the caller saying he was outside the store and in a small grey truck.

4. S/A Himes exited the store and observed a small grey SUV outside at the gas pumps with a passenger on a cell phone. He then returned inside the store and was again told that the vehicle was outside. S/A Himes once again returned outside only to see the small grey SUV depart the parking lot. Upon returning to the store, he was told that the vehicle exiting the parking lot was the vehicle in question.

5. S/A Himes again exited the store and this time happened to notice a man drive by the store in a white Buick Regal passenger car. This man was talking on a cellular phone and was driving in and around the vicinity of the store. At this time, S/A Himes also noticed that the grey SUV had returned to the parking lot. He, thereafter, engaged the occupants of the SUV in a conversation. One of the two individuals was Co-Defendant Jose Mercedes Gamiz-Morga. A large amount of money was found in Gamiz-Morga's vehicle. In addition, a search of Gamiz-Morga's cellular phone revealed the phone number of Meza-Aguilar, who was still inside the store.

6. During the above mentioned encounter with Gamiz, S/A Himes noticed the white Buick Regal passenger vehicle drive up to the store parking lot. At least one marked police vehicle from the Belen Police Department was parked in the store parking lot. Although no mention had been made of a small white passenger vehicle during the investigation, S/A Himes decided to approach the vehicle and question the driver. The driver was Defendant, Mario Aispuro-Gamez. S/A Himes tapped on the drivers window and displayed his badge of office. After the agent asked to speak with him, this Defendant indicated he did not speak English. The agent told him to wait for S/A Perry to arrive and then asked him for his driver's license. This Defendant produced a valid Mexican drivers license. At this time, the Agent took possession of the Defendant's vehicle keys and left. At the hearing on Defendant's Motion to Suppress, S/A Himes admitted that his actions up to this point were based on a hunch he had that the Defendant was engaged in criminal activity.

7. S/A Himes' returned later with S/A Perry. While S/A Himes maintained possession of the Defendant's vehicle keys, S/A Perry obtained permission to search the Defendant's person, wherein he found an amount of U.S. currency in various denominations, and a cell phone in this Defendant's coat pocket. S/A Perry obtained permission to search the vehicle upon which time he found a bag containing a shoe box and another cellular phone. In the trunk he found two store tags. There were no drugs or firearms found on this Defendant's possession. Based on this search, the Defendant Aispuro-Gamez was arrested. A stationhouse statement was taken from the defendant soon after.

**CONCLUSIONS OF LAW**

1. The Fourth Amendment guarantees that people be secure against unreasonable search and seizures. The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of this provision. Whren v. U.S., 517 U.S. 806, 809 S.Ct.1769, 1772 (1996). This temporary stop or detention must be justified at its inception and the detention must be reasonably related in scope to the circumstances that justified the interference in the first place. Law enforcement officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity. Terry v. Ohio, 392 U.S 1, (1968).

2. In the present case, there are no facts which would support a Terry type

detention. The Defendant was merely seen traveling around a store where drugs were found amidst many other customers doing legitimate business at the store. Driving up to the store in the middle of the day, and previously talking on a cell phone, is completely innocent activity. Moreover, not only had the Agents already apprehended the individual assigned the task of picking up the people with the drugs, but the vehicle the Defendant was driving (white Buick passenger car) in no way matched the description of the vehicle they were looking for (small grey SUV or truck). Indeed the Agents had even searched the cell phone of the driver of the grey truck and had found Meza-Aguilar's phone number on the phone.

3. In this case, there was no lawful justification for the initial stop of the Defendant. Absent having observed the commission of a legitimate traffic violation, the police could legally stop the Defendant only if they possessed the requisite probable cause or reasonable suspicion to believe that the Defendant, or his vehicle, contained contraband. U.S. v. Ross, 456 U.S. 798 (1982), Chambers v. Maroney, 399 U.S. 42 (1970). Therefore, the seizure of the Defendant herein was unlawful because it was unjustified at its inception. It was unjustified because the stop was not based upon reasonable suspicion of either an observed traffic violation, as required by Whren, or of an articulated suspicion of narcotic activity.

4. As stated above, law enforcement officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity. In order for such a stop to be legal, the government must point to specific and articulable facts,

together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is eminent. Terry at 21-22. Inarticulable hunches or generalized suspicions are insufficient. Ybarra v. Illinois, 444 U.S. 85 (1979) (no reasonable suspicion to detain patron, even though police had warrant to search tavern and had generalized suspicion that drug transactions took place in tavern, because no indication that patron was armed); See U.S. v. Brignoni-Ponce, 422 U.S. 873 885-886 (1975) (no reasonable suspicion for border agent to detain person based solely on apparent Mexican ancestry). In the present case, S/A Himes was clearly acting upon a hunch when he stopped and questioned the Defendant and when he confiscated the Defendant's vehicle keys. He even admitted this when he testified at the suppression hearing.

5. At the heart of the reasonable suspicion standard are a law enforcement officers personal observations. See U.S. v. Sharp, 470 U.S. 675 682 n.3 (1985) Observing and stopping an individual who was previously using a cell phone, had driven up to the Mini Mart after all the offenders had already been apprehended and driving a vehicle that did not match the description of the vehicle in question, is nothing more than the product of a hunch and an unreasonable generalized suspicion.

6. Under certain circumstances, a brief detention can ripen into an arrest, thereby requiring the presence of probable cause. In determining whether an arrest has occurred, the Courts must examine all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority

employed. See U.S. v. Torres-Sanchez, 83 F,3d 1123 (9th Cir. 1996). This is what occurred in the present case. S/A Himes tapped on the Defendant's window and began to question him. Unable to converse in Spanish, the Agent had the Defendant remain in his vehicle while he went to obtain help from S/A Perry. However, before leaving the Defendant in his vehicle, S/A Himes took the Defendant's vehicle keys with him. In doing so, the Defendant was obviously not free to leave and terminate the encounter with the agents.

7. An arrest occurs when, in view of all the circumstances, a person reasonably believes he is not free to leave. U.S. v. Mendenhall, 446 U.S. 544 (1980). See Florida v. Royer, 460 U.S. 491 (1983) (officers held the defendant's ticket, luggage and identification and therefore as a practical matter, the defendant was under arrest because he was not free to go). Since the Defendant in the present case arrived at the store in a vehicle, and thereafter had the keys to the vehicle confiscated by S/A Himes, he reasonably believed he was not free to leave.

8. If the above stated facts do not satisfy the reasonable suspicion standard as the Defendant asserts herein, then surely they do not rise to the level of probable cause necessary to effectuate an arrest. Probable cause is defined as those facts and circumstances known to the police which would warrant a prudent man to believe that the arrestee has committed an offence. Henry v. U.S., 361 U.S. 98, 102 (1959). The facts in this case do not support a finding of probable cause.

9. Once S/A Himes and Perry returned to the Defendant's vehicle, it is

alleged that S/A Perry asked permission to search the Defendant's person and, ultimately, also searched the Defendant's vehicle. The prosecution bears the burden of proving that consent was voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). U.S. V. Jones, 234 F.3d 234 (5th Cir. 2000). Under these circumstances, however, it can not be said that the consent obtained was voluntary. S/A Himes had the Defendant's keys to his vehicle. See U.S. v. Jones id., U.S. v. Benitez -Arreguin, 973 F.2d 823, 825-26 (10th Cir.1992) (consent void when Spanish-speaking defendant did not understand right to refuse consent to search bag and officer had his green card); U.S. v. Lee, 73 F. 3d 1034, 1040 (10th Cir.1996) (where consent to search was requested and obtained before license was returned, consent was not voluntary). In the present case, there was no evidence presented that the Defendant was informed that he had a right to refuse consent.

10. At the time the Defendant's vehicle keys were confiscated, the Defendant could reasonably believe he was not free to leave and was, therefore, under arrest. If at this point in time the Agent's did not possess reasonable suspicion for detaining the Defendant, they certainly did not possess probable cause for an arrest. All that was found in the Defendants possession was U.S. currency in various denominations, two cell phones, some store tags and a bag with an empty shoe box. No drugs or firearms were found, nor anything else to connect him to the drugs found earlier. In addition, the agents had already apprehended the driver with the suspected vehicle ready to make the pick-up. Also, the Defendant's vehicle did not fit the description of the vehicle the

agents were attempting to locate. These are not the types of facts and circumstances that would lead a prudent police officer to reasonably believe the Defendant had committed a crime.

11. The evidence and statements taken from the Defendant following the stop of the Defendant, were the fruits of an illegal search and seizure. This being so, this evidence must be suppressed under Mapp v. Ohio, 371 U.S. 471, 654 (1961). There is nothing in the evidence presented to show that the taint from the Fourth Amendment violation was purged at the time the Agents obtained permission to search. In so deciding, this Court must look to the temporal proximity of the illegal detention and consent and also to the purpose and flagrancy of the agent's misconduct. U.S. v. Caro, 248 F3d 1240 (10th Cir. 2001). See also U.S. v. Jones, 234 F.3d 234 (5th Cir. 2000).

WHEREFORE, Defendant Mario Aispuro-Gamez requests that this Court adopt the above proposed findings of fact and conclusions of law.

Respectfully Submitted,

EDWARD CHAVEZ, JR.
Attorney for Defendant
1301 Rio Grande Blvd. NW, Suite 3
Albuquerque, NM 87104
(505) 243-5975

I hereby certify that the foregoing pleading was hand-delivered to AUSA this 30th day of March, 2004.

Edward Chavez, Jr.