IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                                                    No. CR 04-66 BB

ANTONIO MEZA-AGUILAR,
JUAN CARLOS MORALES-GRACIA,
and MARIO AISPURO-GAMEZ,

      Defendants.

MEMORANDUM OPINION
AND
ORDER ON MOTIONS TO SUPPRESS

THIS MATTER came before the Court on the motions to suppress of each of the named Defendants, and the Court having conducted a full evidentiary hearing on March 17, 2004, and reviewed all the briefs of counsel, holds that the motions of Juan Carlos Morales-Gracia and Antonio Meza-Aguilar be Denied and the motion of Mario Aispuro-Gamez be Granted. In addition to my remarks at the conclusion of the hearing, this Opinion will constitute the Court's findings of fact and conclusions of law.

*Discussion*

*Facts*

On December 13, 2003, DEA Agent Jay Perry placed a lookout with U.S. Customs Service on a male, previously identified as Antonio Meza-Aguilar, concerning Meza-Aguilar's travel from Juarez, Mexico, into El Paso, Texas. Perry placed the lookout

because he had observed Meza-Aguilar and another male, whose name Perry did not know (later identified as Juan Carlos Morales-Gracia), travel from the Albuquerque area to El Paso via bus on numerous occasions in the past. Perry had, however, never observed Meza-Aguilar or his unknown companion travel from El Paso to Albuquerque. On several occasions Perry had conducted consensual conversational encounters with Meza-Aguilar and his unknown companion. At each encounter, Perry noted that the men reported they had approximately $1,500 to $2,000 United States currency with them. Neither Meza-Aguilar nor his unknown companion ever traveled with any observable luggage.

On December 15, 2003, at approximately 9:00 AM, Perry received a telephone call from U.S. Customs Inspector Rogelio Portillo in El Paso, who informed Perry that Meza-Aguilar walked across the Mexican border into El Paso. Perry was informed that Meza-Aguilar had no luggage and carried only a small black portfolio.

Perry contacted El Paso Limousine Express bus personnel and obtained information concerning passengers departing El Paso at 10:00 AM to Albuquerque. Perry obtained itinerary information that revealed that Antonio Meza-Aguilar and a man identified as Jesus Meza were traveling in assigned seats #41 and #42 and were to be dropped in Belen, New Mexico.

Perry and DEA Agent Jeff Himes traveled to Belen and set up surveillance in the area of the downtown near Al's Mini-Mart Convenience Store and gas station since the

El Paso bus drops off passengers in the parking lot across the street. When the bus pulled in, Perry observed two males, Meza-Aguilar and the other unknown male Perry recognized from previous encounters, deboard the bus. Perry observed that Meza-Aguilar was carrying a dark-colored plastic shopping-type bag, and the other male, later identified as Morales-Gracia, was carrying a white-colored plastic shopping-type bag. Perry observed Meza-Aguilar talking on a cellular telephone, as the two walked across the street and entered Al's. Perry also entered the store, followed by Himes. Perry approached both Meza-Aguilar and Morales-Gracia and said hello. The two separated and moved in opposite directions in the store. Meza-Aguilar walked to the rear as Morales-Gracia walked toward the front of the store.

Perry pointed out Morales-Gracia to Himes and approached Meza-Aguilar. Perry identified himself and displayed his DEA credentials and received consent to speak with Meza-Aguilar. Perry observed that the shoes were thick and looked overly heavy. Perry asked for and received permission from Meza-Aguilar to conduct a search of his shoes and observed a brown plastic taped bundle located underneath the shoe insole. Perry knew from his training and experience that the bundle was consistent with the packaging of illegal narcotics. Perry handcuffed Meza-Aguilar, thus placing him under arrest.

Meanwhile, Himes, who speaks no Spanish, confronted Morales-Gracia, who has no functional knowledge of English. After motioning to Morales-Gracia to raise his

arms, Himes conducted a pat-down. He then escorted Morales-Gracia by the arm to where Perry could attempt to make a *Terry*-type inquiry as to where Morales-Gracia was traveling, etc. As they approached Perry, he was looking inside the shoe of Meza-Aguilar where he discovered the bundle of what appeared to be illegal narcotics. Perry then addressed Morales-Gracia. Perry again identified himself, displayed his credentials, and asked for and received consent to speak to Morales-Gracia. Perry also asked for and received consent to search the shoes Morales-Gracia was wearing. Himes picked up the shoes, and noted they were unusually heavy. Himes also observed that the shoes had glue located inside the sole area. Perry then asked for and received consent to search the contents of the white-colored, plastic shopping bag that Morales-Gracia was carrying. Inside was a pair of tennis shoes inside of a shoe box. Perry removed one of the shoes and observed that it too was overly heavy and also had a brown plastic-wrapped bundle underneath the inside sole area. Morales-Gracia was arrested.

      Morales-Gracia and Meza-Aguilar were escorted to a small storeroom in the back of the Mini-Mart. A store employee fluent in Spanish came into the storeroom to assist Perry in communicating *Miranda* rights and interrogating the prisoners. Post *Miranda*, and while inside the storeroom, Meza-Aguilar said he was to be picked up in 20 minutes by someone in a grey colored truck and he received four phone calls on his cell phone. Himes went outside where he observed a grey Isuzu Rodeo and a white Buick Regal enter and exit the store parking lot. Meza-Aguilar received three calls telling him the

grey truck was in the parking lot and at one point said they would circle back as a suspicious white male was in Al's parking lot. Although Himes was looking at the grey Isuzu Rodeo which had a passenger talking on a cell phone, he did not equate it with a small grey truck. He then returned inside the store and was again told that the vehicle was outside. Himes once again returned outside only to see the small grey Isuzu Rodeo depart the parking lot. Upon returning to the store, he was told the vehicle exiting the parking lot was the vehicle in question.

Himes again exited the store and again noticed the white Buick Regal being driven by a man on a cellular phone driving in and around the vicinity of the store. He then noticed that the grey Isuzu Rodeo had returned to the parking lot. He approached and engaged the occupants of the Isuzu in a conversation. The passenger who had been on the cell phone was Jose Mercedes Gamiz-Morga who consented to the search of the vehicle where $4,000 was found wrapped in a bundle in the glove box. In addition, a search of Gamiz-Morga's cellular phone revealed the phone number of Meza-Aguilar, who was still inside the store. A marked Belen police unit arrived and the occupants of the Isuzu were escorted into it.

Himes then noticed the white Buick was still parked in front of the store with the engine on. Although no mention had been made of a white passenger car during the investigation, Himes was "suspicious" and decided to approach the vehicle and question the driver. (At one point it even crossed Himes' mind this vehicle "could possible be

counter surveillance," but he then saw the grey Isuzu again and proceeded toward it.) The driver of the Buick turned out to be Mario Aispuro-Gamez. Himes tapped on the driver's window and displayed his badge of office. After the agent asked to speak with him, Aispuro-Gamez indicated he did not speak English. Himes said "licensia" and Aispuro-Gamez handed him his valid Mexican driver's license. At this point Aispuro-Gamez put his hand on the gear shift and Himes commanded, "Don't do it." Himes then took Defendant's vehicle keys out of the ignition and went to get Perry.

*Law*

The Fourth Amendment protects against unreasonable seizures. *U.S. Constitution Amendment IV*. However, police are free to approach people in public areas and initiate conversations directed toward possible criminal conduct or even suspicious circumstances. *United States v. Hill*, 199 F.3d 1143, 1149-50 (10th Cir. 1999). In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v. Hall*, 978 F.2d 616, 619-20 (10th Cir. 1992). Police may also seek voluntary consent to search or inspect a person or their affects. *United States v. Benally*, 146 F.3d 1232, 1240 (10th Cir. 1998). Perry requested and received voluntary consent to examine the shoes worn and the bag carried by Meza-Aguilar. The discovery of heroin was a

result of such voluntary consent and did not violate the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

The factual situation between Himes and Morales-Gracia is somewhat more complicated but the legal analysis is similar.  Perry had informed Himes that Meza-Aguilar and Morales-Gracia were suspected of trafficking in narcotics based on their frequent bus trips which culminated in a return to Mexico with substantial sums of cash. Himes had also previously seized heroin concealed in the footwear of Mexican travelers. When Himes approached Morales-Gracia to ask about travel plans, it was clear Himes spoke virtually no Spanish and Morales-Gracia virtually no English.  Because of this language barrier, Himes escorted Morales-Gracia toward Perry as the latter was in the process of discovering heroin in Meza-Aguilar's shoe.  On these facts, Himes was justified in directing Morales-Gracia toward someone who could speak at least basic Spanish, Agent Perry. *United States v. $189,825.00 in United States Currency*, 8 F. Supp. 2d 1300, 1309 (N.D. Okla. 1998), *aff'd*, 216 F.3d 1089 (10th Cir. 2000).

Perry then asked for and received consent to speak with Morales-Gracia in the Spanish language and later consent to conduct a search of his shoes.  Morales-Gracia untied and removed his shoes for examination.  While Himes was examining one of the shoes, Perry asked for and received consent to search a shopping-type bag carried by Morales-Gracia.  The search was consensual and the discovery of the heroin in Morales-

Gracia's shoe complied with the Fourth Amendment.  *United States v. Hill*, 199 F.3d at 619.

The detention of Aispuro-Gamez, however, presents a very different situation.  The detention of an automobile and its driver, even if only for a brief period and for a limited purpose, constitutes a seizure of person within the meaning of this provision.  *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).  Law enforcement officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity.  *Terry v. Ohio*, 392 U.S. 1 (1968).

Himes was therefore free to approach Aispuro-Gamez and ask routine questions as to why he had been circling Al's parking lot and even to whom he was talking on his cell phone.  At that time, however, Himes had already found the small grey truck, apprehended Gamiz-Morga, and verified his cell phone had called Meza-Aguilar and Morales-Gracia three times while they were at Al's.  *Cf. United States v. Edwards*, 242 F.3d 928, 929 (10th Cir. 2001) (no basis for suspicion after determination that bank had not actually been robbed).  At this point, then, Himes had only a hunch the white Buick might be involved with Gamiz-Morga or was generally demonstrating suspicious activity.  When Himes told the driver, Aispuro-Gamez, to take his hand off the gear shift and then reached in and took the keys out of the ignition, this was a seizure under the Fourth Amendment.  *United States v. Hudson*, 210 F.3d 1184, 1910-11 (10th Cir. 2000); *Capraro v. Bunt*, 44 F.3d 690, 691 (8th Cir. 1995).  At this point, Himes knew (1)

Aispuro-Gamez was from Mexico; (2) he drove slowly through Al's lot twice; (3) he was talking on his cell phone; and (4) the grey truck associated with Meza-Aguilar and Morales-Gracia had been apprehended. This is insufficient to reasonably suggest Aispuro-Gamez was involved in criminal activity and the subsequent search violates the Fourth Amendment. *United States v. Salzano*, 158 F.3d 1107, 1111-15 (10th Cir. 1998); *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000).

### O R D E R

For the above stated reasons, the motions to suppress of Defendants Meza-Aguilar [#62] and Morales-Gracia [#37] are DENIED; the motion of Defendant Aispuro-Gamez [#35] is GRANTED; and the Government's motion to reconsider [#70] is DENIED.

SO ORDERED this 6th day of April, 2004.

_____
**BRUCE D. BLACK**
**United States District Judge**